

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00193-CR
_____

CHARLES EUGENE ORANGE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 34,849-B

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Charles Eugene Orange was convicted by a Gregg County jury of indecency with a child by contact.[1]  The jury recommended a sentence of five years' imprisonment, but recommended suspension of that sentence and community supervision, a recommendation reflected in the trial court's imposition of sentence.  Orange raises ten points of error on appeal, which we group in the following categories of complaint:  sufficiency of the evidence; alleged juror misconduct; alleged error in the exclusion of evidence of Orange's acquittal in an earlier trial of similar offenses, including an allegation of double jeopardy; and alleged error in two evidentiary rulings by the trial court.  After reviewing the records and considering oral argument from the parties, we overrule Orange's points of error and affirm his conviction.  We modify the trial court's judgment to accurately reflect the offense of which Orange was convicted, and as modified, we affirm.

**I.      SUFFICIENCY OF THE EVIDENCE**

**Standards of Review**

In reviewing the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict, and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

---

[1]*See* TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon Supp. 2009).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

In our review of the sufficiency of the evidence, we are instructed to use the hypothetically-correct jury charge analysis to evaluate both the legal and factual sufficiency of the evidence. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).[2]

Applying the hypothetically-correct jury charge analysis, we find that in order to convict Orange of the offense of which he was convicted, it was necessary for the State to prove beyond a reasonable doubt that (1) Orange (2) engaged in sexual contact (3) with a child younger than seventeen years of age who was not his spouse. TEX. PENAL CODE ANN. § 21.11(a)(1). "Sexual contact" means "any touching of the anus, breast, or any part of the genitals of another person with

---

[2]We find the trial court's charge to the jury used in this case to have been in substantial—if not complete—compliance with the applicable law, and thus, the equivalent of a hypothetically-correct charge.

intent to arouse or gratify the sexual desire of any person."  TEX. PENAL CODE ANN. § 21.01(2) (Vernon Supp. 2009).

## II.  DIRECT EVIDENCE:  J.P.'s TESTIMONY

J.P., the victim, was fourteen years old at the time of trial.  Living with J.P. in a trailer park in Kilgore, Texas,[3] were three other permanent residents:  J.P.'s mother, Theresa Williams, her husband and J.P.'s stepfather, Mark Williams, and J.P.'s one-year-younger sister, S.P.  There were at least two other intermittent residents of the mobile home:  Theresa's cousin, Angie Baker, and Angie's boyfriend, Steven Stewart.  Further, during the period between 2002 and 2004, Orange lived with J.P. and his family.  During his period of residency with the family, Orange stayed in J.P.'s room.  J.P. testified that during this period, Orange frequently got into bed with him and touched him, saying that Orange "touched me . . . [i]n my private."  He went on to explain that "private" meant his penis and that Orange had touched his "private" with Orange's "hands, his mouth and his private."  This touching was underneath J.P.'s clothes while they were lying down.  Orange points out that despite this more serious charge by J.P., the jury acquitted him of aggravated sexual assault, but convicted him only of indecency with a child by contact.

---

[3]Kilgore, Texas, is situated astride the line between Gregg and Rusk Counties.  We address venue in our analysis of Orange's tenth point of error.

## III. CIRCUMSTANTIAL EVIDENCE

Bunny Terrell, a forensic interviewer with the Children's Advocacy Center (CAC) in Longview, testified that she conducted two interviews with J.P. In the first such interview (conducted on November 30, 2004), J.P. initially stated no one had engaged in any inappropriate touching with him. However, when Terrell asked if anyone made J.P. do things he did not want to do, J.P. used a marker or pen to point to Orange's name on a sheet upon which Terrell had written the names of persons living in J.P.'s home.[4] In the second interview (conducted in July 2006), J.P. said that Orange had touched J.P.'s penis and that Orange had put J.P.'s penis in Orange's mouth. Terrell also offered expert testimony about a technique commonly used by sexual abusers called "grooming." She explained that this is a process whereby sexual abusers establish rapport with a child victim by giving gifts or special attention to the child. She also explained what she called child abuse accommodation syndrome, which she described as a "child accommodat[ing] the abuse"; under this syndrome, the child basically learns to live with or abide the abuse because if they told of the abusive conduct, "things could be worse." J.P. told Terrell that Orange slept in the bed with him. When J.P. talked to Terrell in 2004 about J.P.'s sleeping on the couch, he said Orange forbade

---

[4]A video recording of Terrell's November 2004 interview with J.P. was introduced as State's Exhibit 1. Terrell testified that interview was about an hour long; however, the copy supplied to this Court ends abruptly after about thirty-seven minutes, clearly in the middle of the interview. Although providing exhibits to the appellate court is the court reporter's responsibility (*see* TEX. R. APP. P. 34.6(a)(1)), in cases like this where audio/visual exhibits are entered into evidence, the proponent of that evidence would do well to see that the Court is supplied with either the actual exhibit or a useable copy.

5

it, and quoted Orange as saying, "You aren't going to get that stinky smell on you; you are going to stay right here."[5]

Orange moved in with J.P.'s family sometime during J.P.'s third-grade year. June Bedford, J.P.'s third-grade teacher, testified that J.P. was not popular and was made fun of by other students. He had been infested with lice "a lot," he came to school with "bed head," sometimes wore the same clothes two days in a row, his clothes might be worn inside out, and his clothes looked as though they came from Goodwill. He often had dirty hands when he came to school and Bedford had to make sure he washed. However, by the fourth or fifth grade, J.P.'s appearance took a dramatic turn for the better. He was dressed in nice new clothes, which he said Orange had bought for him, and J.P. sported jewelry, such as a necklace and a bracelet. Orange said that J.P. had gotten the necklace by taking quarters out of a can in which Orange kept them and then bought the necklace from a boy at school.

J.P. testified that he regularly slept in his "sleep clothes," which consisted of a shirt and shorts and that Orange slept in his "boxers" underwear, but that J.P. would sleep in his underwear if Orange was not present. Orange bought toys (i.e, "[s]kateboard stuff and bike stuff"), jewelry, and clothing for J.P. When they went out together, Orange would spray his cologne on J.P. Orange enrolled J.P. in karate classes and in soccer. Orange frequently took J.P. to Chuck E. Cheese, to the BMX track,

---

[5]There was evidence the home had a veritable menagerie of animals comprised of three dogs, two ferrets, two hamsters, and a cockatiel. The dogs seemed to have free range of the interior of the house and routinely urinated and defecated in it.

and to Skateplex for rollerblading. At home, they played together on the Xbox that Orange provided. J.P. testified that Orange would prevent him from seeing the rest of his family by making J.P. stay in his bedroom with Orange. Orange kept the door to J.P.'s room closed when they were in the room together. J.P. testified Orange liked to keep things secret, elucidating that "like stuff we do in our room, he wouldn't want nobody to know." Cheryl Holla, the assistant principal when J.P. was in fifth grade, said J.P. told her one day either that "Charles and I sleep together," or that "We sleep in the same bed together." Even though she could not precisely recall which phrase was used, she said that at the time it was told to her, she was not sufficiently concerned with the content of the statement to notify Child Protective Services (CPS).

J.P. explained that his fear of Orange caused him to not initially report the sexual abuse; he said that he was afraid of Orange and feared that Orange would hurt members of J.P.'s family. J.P.'s mother testified that J.P. had overheard Orange tell her, "if anybody ever come through the relationship of him and my son, that he would kill me." J.P. also testified that he overheard the threat. Contrarily, it should be noted that several witnesses testified that they had seen J.P. and Orange interact and did not think that J.P. feared Orange.

## IV.    J.P.'S HOME LIFE

J.P.'s mother acknowledged that CPS had been involved with some oversight of the family as far back as 1997. She said that CPS had responded to allegations of neglect. At that time, J.P. received a third-degree burned finger from sticking it in an electrical box; however, she denied any

7

memory of allegations that the children had suffered blackened eyes or other bruises or of CPS having received a report of lack of adequate supervision of the children. Theresa did admit to having discovered S.P. and J.P. acting out or experimenting sexually many times; on those occasions, she had talked to the children and told them the behavior was wrong, but they persisted in it. Mark said he understood Orange's desire to keep the door to J.P.'s room shut so as to exclude the dogs. Theresa admitted to having applied the bug killer Raid on the heads of S.P. and J.P. and on their beds in an effort to rid them of lice, but denied having used kerosene in that effort. However, Bertile Johnson, a CPS investigator, said that her agency had received a report of kerosene being used and that she had determined that she had "reason to believe" that the children had suffered physical abuse because of the use of kerosene.

Theresa related that Orange had told her in 2002 that he had nowhere else to go and that she had allowed him to move into the Williams home at that time. She was injured in an automobile accident in February 2003 and came to rely on Orange's help around the house during her period of recovery. Orange was listed, along with Theresa's mother, with school officials as a person authorized to pick up the children from school in the event of an emergency. Although Theresa asked Orange to sleep on the couch, he said he would sleep on the floor in J.P.'s room. She became aware that Orange was sleeping in the bed with J.P., but did not think anything was amiss in the arrangement because they were two males. Though Orange worked nights at Wal-Mart, he would sleep in the bed with J.P. on his nights off, and on the nights he was working, he would lay down

8

with J.P. to get him to go to sleep before going to work. She admitted she never did anything to keep Orange from sleeping with J.P. because she did not think that anything wrong was taking place. Theresa testified that she grew to fear Orange and that Orange prevented J.P. from taking his ADHD medication. When Theresa would try to talk to Orange about keeping the door to J.P.'s room shut all the time, Orange would threaten to call CPS.

Katy Wady, a CPS investigator, said she talked to J.P. when he was about seven or eight years old; she had been investigating reports of the children having lice. J.P. made an allegation against Mark, his stepfather, but it does not appear that any criminal case was pursued. Mark denied the allegation. Wady did say there was a discussion about sexual acting out by S.P. and J.P. S.P. also reported her "tushy" hurting and Mark watching a "naked movie." Further, two other CPS investigators, to whom J.P. did not make an outcry of abuse, did testify that if an unrelated adult male was sleeping in the same bed with a child, it would cause them concern.

## V.    DEFENSIVE CASE-IN-CHIEF

Orange presented several witnesses whom he had either babysat as children or parents for whom he had acted as a babysitter; they each testified that they thought he was safe to be around children and that he had never harmed or abused children to their knowledge. He also presented teachers and faculty from J.P.'s school who testified variously that J.P. had a bad reputation for truthfulness and who generally expressed that they did not find J.P. to be a credible person. One teacher also testified she did not find J.P.'s mother, Theresa, credible. Bedford, the third-grade

9

teacher, also testified J.P. frequently lied about homework and events in school, to the extent that when he told her about his mother being involved in an automobile accident, Bedford did not believe J.P.

Orange took the stand and categorically denied J.P.'s allegations, also contradicting several elements of testimony given by J.P. and his family. He said he had never been kicked out of his mother's house. His version of the story was that he had known Theresa socially from the trailer park neighborhood and that it was Theresa who offered to let Orange live in her family home so that he could get to work easier, saying that he had previously been living with his mother, who resided some seven miles out of town. Orange said that he could not abide the filth in the Williams home, so he ate and bathed at his brother's house. He cleaned J.P.'s room, where he stayed, including weekly steam-cleaning of the carpet. He testified that he kept the door closed to keep the dogs out and that he did J.P.'s laundry because Theresa never did.

Orange explained that he worked the overnight shift at Wal-Mart and that if J.P. was not at home, he would sleep in J.P.'s bed; otherwise, he would sleep on the floor, using a pallet, egg crate, or an air mattress. He said that on one occasion, J.P. had come down to the floor to sleep with him and Orange had not been aware of that until awakening.

Orange said after living in the Williams home about a year (about December 2003), he began to spend more time with J.P. and began getting him involved in karate and soccer. Orange said that he did this because Mark was away so much and because he believed that Theresa neither adequately

10

supervised J.P., nor devoted sufficient time to him. He denied giving J.P. preferential treatment over S.P.; rather, he said the children had to earn special treatments (such as going out to eat) by performing small chores and S.P. seldom did the little chores for which Orange graded them. He did say that he had bought clothes for S.P., a statement which was contradicted by other witnesses.

Orange testified that on four occasions during the period he lived with the family, he found S.P. and J.P. in various states of undress engaged in sexual contact. Wady had interviewed J.P. about these activities in April 2000. In this interview, J.P. had also made an allegation that Mark had engaged in some form of touching of J.P.'s "privates." There were also statements by J.P. in 2005 to CPS worker Johnson that at some point in the past, a relation of J.P.'s stepfather named "William" had engaged in some form of abusive behavior toward J.P. and S.P., but these allegations were not clearly developed or explained in the record. During oral argument, Orange (referring to evidence that on several occasions, J.P. and S.P. had been caught engaging in sexual touching or activities) argued there was evidence J.P. had been "sexualized" since about the age of five or six.

Orange said that he had caught Theresa having an affair with Steve, the boyfriend of Theresa's cousin, Angie Baker. Orange said he told Mark about the affair, but when Mark talked to Theresa about it, she said that Steve had just been sleeping on the floor near where Angie had been sleeping in Theresa's bed with Theresa. Orange said because of this affair, Theresa and Steve concocted a scheme to get Orange out of the house. Orange said that he overheard Theresa and Steve plot to get S.P. to make an allegation of impermissible touching against Orange, but that S.P.

11

had refused to participate. Failing this, Orange maintained, they convinced J.P. to make the allegations.

The State then called Angie on rebuttal. She denied that Theresa and Steve had engaged in an affair and denied, further, Orange's testimony that he had found Angie crying about the affair and that she had talked to Orange about it. Angie testified that Orange's testimony was the first that she had ever heard about an alleged affair between Theresa and Steve. Theresa denied having had an affair with Steve.

## VI.  LEGAL SUFFICIENCY

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found the elements of indecency with a child by contact beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Although our analysis considers all evidence presented at trial, in a legal sufficiency review, we may not reweigh the evidence and substitute our judgment for that of the jury. *King*, 29 S.W.3d at 562. We find the evidence to be legally sufficient to support the conviction. Accordingly, we overrule Orange's first and second points of error.

## VII.  FACTUAL SUFFICIENCY

Examining the evidence in a neutral light, we observe that J.P. testified to the abuse by Orange. Orange emphasizes evidence calling J.P.'s credibility into question, but the credibility of witnesses is a matter for the jury to resolve. Once we have determined that the evidence raised issues for the jury's resolution, we will not sit as the thirteenth juror re-evaluating the weight and credibility

12

of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We give full play to the jury's responsibility to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). Orange also points out that despite J.P.'s statement that Orange put J.P.'s penis in Orange's mouth, the jury acquitted Orange of the offense of aggravated sexual assault,[6] but convicted him of indecency by contact. The finder of fact determines the weight to place on contradictory testimonial evidence because that determination depends on the fact-finder's evaluation of credibility and demeanor. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997). As the determiner of the credibility of the witnesses, the fact-finder may choose to believe all, some, or none of the testimony presented. *Id*. at 407 n.5. As an appellate court, we may not reweigh the evidence or substitute our judgment for that of the fact-finder. *Johnson v. State*, 967 S.W.2d 410, 412 (Tex. Crim. App. 1998); *King*, 29 S.W.3d at 562.

As for Orange's denials of the offense, explanations of his behavior while living with J.P. and his family, and witnesses testifying to the lack of credibility of J.P. and his mother, and to Orange being a safe person around children, we can neither say the evidence is so obviously weak as to undermine confidence in the verdict, nor is the evidence, if taken alone, greatly outweighed by

---

[6]*See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii) (Vernon Supp. 2009).

13

contrary proof so as to be clearly wrong and unjust. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). The evidence is factually sufficient.

We overrule Orange's third and fourth points of error.[7]

## VIII. ALLEGATIONS OF JURY MISCONDUCT

### A. Affidavits Could Not be Considered

In his fifth point of error, Orange claims that the jury engaged in misconduct and the trial court erred in not granting Orange's motion for new trial based on this alleged misconduct. In his points regarding jury misconduct, Orange relies on affidavits from two jurors,[8] which generally claim the verdict was reached by compromise; that is, because the jury could not agree on a unanimous verdict, they agreed to find Orange guilty of indecency with a child (the lesser offense) and then recommend community supervision.

Orange's complaints are foiled by Rule 606(b) of the Texas Rules of Evidence:

> **Inquiry into Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or

---

[7]Orange's fourth point of error basically asserts that because the State acknowledged in opening argument that J.P. had a history of telling lies, his testimony must be completely discounted or excluded from consideration. We construe this argument as an attack upon J.P.'s credibility, which was considered and decided by the jury.

[8]Orange also attempts to rely on a third document to which he refers as an affidavit. However, that document is not signed; there is a copy of an email in the record purporting to be from the juror stating that although he did not want to sign it, he would appear to testify about its content.

dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

TEX. R. EVID. 606. This rule plainly forbade the trial court from considering the juror affidavits to the extent they discussed matters occurring in deliberations. *See State v. Krueger*, 179 S.W.3d 663, 665–66 (Tex. App.—Beaumont 2005, no pet.) (trial court granted motion for new trial based on informal discussions between court, attorneys, and jurors following trial; court of appeals reversed because jurors' statements not competent evidence under Rule 606(b)); *Davis v. State*, 119 S.W.3d 359, 365–66 (Tex. App.—Waco 2003, pet. ref'd) (testimony of jury's consideration of parole application not permitted under Rule 606(b) at hearing on motion for new trial); *Hines v. State*, 3 S.W.3d 618, 621 (Tex. App.—Texarkana 1999, pet. ref'd) (stating under Rule 606(b), jurors not competent to testify "that they decided the verdict by lot, that they decided the case based on another juror's incorrect statement of the law, or that they discussed the defendant's failure to testify and used that failure as a basis for convicting him"). The affidavits from the jurors could not be considered to attack any matter within the jury's deliberations.

### B. Bifurcated Trial

Orange also claims the alleged jury misconduct denied him a bifurcated trial. He supports this claim by pointing to a note from the jury, during guilt/innocence deliberations, asking whether the jury was "responsible for the sentencing phase." The trial court sent back a note saying that in

15

the event of a guilty verdict, it would assess punishment. "However[,] you are not to discuss or concern yourselves with the issue of punishment during your deliberations at this phase of the trial. The sole issue before the jury at this time is whether the Defendant is guilty or not guilty. Please continue your deliberations." Orange also points out that the jury deliberated only twelve minutes on punishment. The jury is presumed to have followed the trial court's instruction in the note above. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Orange has not explained or established how these circumstances demonstrate a denial of the bifurcated trial provided for in Article 37.07. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 (Vernon Supp. 2009).[9]

### C. Outside Influence

Orange also claims an outside influence was brought to bear upon the jury, which he also describes as an indication of jury misconduct. This is a permissible area of juror discussion, per Rule 606(b). One of the juror affidavits says, "it came out that one of the jurors had been molested or abused as a child and she had decided not to have children for that reason. She considered this incident [where a police officer found Orange in a car watching children on a playground with binoculars] important evidence to convict the defendant of something." Orange concludes the juror mentioned in the affidavit must have been the same one who acknowledged, in voir dire, that she had been a victim of sexual assault from the ages of six through twelve. Under questioning by the

---

[9]The only case cited by Orange in this brief assertion of error is *Fairfield v. State*, 610 S.W.2d 771, 779 (Tex. Crim. App. [Panel Op.] 1981), where a footnote mentions that with a guilty plea, the trial becomes unitary, that is, only a punishment trial.

16

attorneys and the trial court, this juror said she could remain impartial and decide Orange's case on the evidence adduced and set aside her personal history. We first point out there is nothing in the record to conclusively establish that the juror who addressed the court following voir dire is the same one referred to in the above affidavit. But more importantly, the plain language of Rule 606(b) indicates that an outside influence is something outside both the jury room and the juror. *White v. State*, 225 S.W.3d 571, 574 (Tex. Crim. App. 2007). "Even a juror's injection of his own personal experiences, knowledge, or expertise is not considered an outside influence, because those representations emanate from inside the jury." *Hines*, 3 S.W.3d at 623 (discussion of parole law at deliberations held not to be an outside influence). Even assuming a juror made reference to personal experiences during deliberations (for which there is decidedly scant if any evidence in the record), there is nothing that would qualify as an outside influence.

## IX.    DENIAL OF MOTION FOR NEW TRIAL

Orange's sixth and seventh points of error claim the trial court erred in not granting Orange's request for a new trial. We review a trial court's ruling on a motion for new trial under an abuse of discretion standard. *State v. Herndon*, 215 S.W.3d 901, 906 (Tex. Crim. App. 2007).

If we understand Orange's sixth and seventh points correctly, he appears to claim that notwithstanding interpretations of Rule 606(b)[10] (discussed above) and Rules 21.4, 21.5, and 21.7

---

[10]*See* TEX. R. EVID. 606(b).

17

of the Texas Rules of Appellate Procedure[11] (addressing motions for new trial) as well as caselaw from the Texas Court of Criminal Appeals and intermediate Texas courts of appeals, the trial court abused its discretion in failing to consider the juror affidavits for the purpose of proving an improper method of reaching the jury's verdict; by refusing to consider the affidavits on the basis they were untimely filed; and that Rules 21.4, 21.5, 21.7, and 606(b) violate the separation of powers doctrine of constitutional law. We have established, in our discussion of Orange's fifth point of error, that Rule 606(b) precludes testimony or affidavits delving into a jury's deliberations. The trial court did not abuse its discretion in declining to consider those parts of the juror affidavits which addressed deliberations.

Additionally, the trial court was well within its discretion to not consider the affidavits at all. The trial court pointed out to Orange language from *Klapesky v. State*, 256 S.W.3d 442, 455 (Tex. App.—Austin 2008, pet. ref'd): "Filing affidavits in support of a motion for new trial more than 30 days after sentencing is considered an untimely attempt to amend the motion." In Orange's case, the judgment was entered June 27, 2008; the motion for new trial was filed July 17, 2008; Orange then filed the affidavits August 26, 27, and 28; and an amended motion for new trial September 3, 2008. An amended motion for new trial must be filed within the thirty-day period prescribed for the filing of a motion for new trial. TEX. R. APP. P. 21.4.; *State v. Moore*, 225 S.W.3d 556, 566 (Tex. Crim. App. 2007).

---

[11]*See* TEX. R. APP. P. 21.4, 21.5, 21.7.

18

Orange claims that Rule 606(b) is unconstitutional because it violates the separation of powers doctrine. Former Chief Justice Cornelius of this Court addressed the constitutionality of Rule 606(b) in *Hines*, 3 S.W.3d at 622–23, and found the rule constitutional. Further, when the Texas Court of Criminal Appeals affirmed this Court in *White*, that court agreed with our finding that 606(b) is constitutional. *White*, 225 S.W.3d at 572–73. Orange also claims 606(b) is unconstitutional because it violates the separation of powers doctrine. He argues that "it violates separation of powers for a Court-made Rule to abrogate a (former) statute." In this contention, Orange refers to former Article 40.05 of the Texas Code of Criminal Procedure; he acknowledges this statute was repealed in 1986 and replaced by the Texas Rules of Appellate Procedure. Once the statute was repealed, it was no longer in effect; therefore, there is certainly no conflict between the legislative and judicial branches there. Orange does not explain how a rule of evidence (implemented by the Texas judiciary) can be in such conflict with the Rules of Appellate Procedure (also implemented by the Texas judiciary) such that a separation of powers violation has occurred. We overrule Orange's sixth and seventh points of error.[12]

---

[12]We do acknowledge a seeming incongruity in 606(b) strict application: i.e., how is a purported instance of juror misconduct to be investigated where the only parties to the deliberation are precluded from discussing events in that deliberation? See Justice Grant's concurrence from several years ago:

> I must express concern about Rule 606(b) of the Texas Rules of Evidence. I urge the Texas Supreme Court and the Texas Court of Criminal Appeals to examine the broad language of this rule in light of the possible consequences. This rule could undermine court procedures and render the jury verdicts and deliberations a mockery. It prohibits jurors from testifying about anything except outside influences that

19

## X.    NO ERROR IN NOT ADMITTING EVIDENCE OF PRIOR ACQUITTAL

In his eighth point of error, Orange claims the trial court erred in preventing the jury from

hearing evidence that Orange had previously been acquitted on three indictments which alleged

offenses similar to those for which he was tried in the instant case. In August 2007, Orange was

tried, in a consolidated proceeding, for three indictments, which alleged various counts of aggravated

sexual assault and indecency with a child; each indictment alleged a different victim. Orange was

acquitted on all counts, on all three indictments. J.P. testified in rebuttal for the State at that trial,

but he was not one of the named victims in any of the three indictments.[13]

---

affected their decision.

. . . .

I understand the need to make verdicts final and the need not to open up the testimony to what might have been each juror's mental processes, but matters affecting the fundamental process of jury deliberation should not be forever closed to judicial review. In the present case, if the jury foreman refused to allow a juror to change his vote prior to the jury returning its verdict to the court, this should be a matter that could be considered by the court.

*Hart v. State*, 15 S.W.3d 117, 124 (Tex. App.—Texarkana 2000, pet. ref'd) (Grant, J., concurring). However, Rule 606(b) has been consistently upheld and applied by the Texas Court of Criminal Appeals, and we find it controls this situation.

[13]In the previous three trials, as well as the instant case alleging J.P. as the victim, Gregg County used "John Doe" and a specific number, probably corresponding with the child victim's date of birth, to identify each complainant. *See* TEX. CODE CRIM. PROC. ANN. art. 57.02(h) (Vernon Supp. 2009).

20

We find that Orange is procedurally barred from asserting this claim because he failed to preserve any such error for appellate review. Specifically, we can find nowhere in the record where Orange either objected to the trial court's ruling that evidence of the acquittals was not admissible, or where Orange specifically told the trial court he wished to introduce this evidence. Prior to trial, Orange filed a motion in limine, covering such areas as prior convictions, prior arrests, prior offenses, and any alleged prior violations of the law. Both parties agreed to be bound by the constraints sought in that motion in limine. Throughout trial, at various conferences and arguments outside the jury's presence, there are numerous mentions of a "motion in limine," which seem to refer to a motion requiring at-the-bench discussions before reference to the prior trial. Further, on the record (but outside the jury's presence), numerous witnesses are admonished to eschew any reference to the judgments from the prior trial or to the other alleged victims; they were instructed, instead, that any reference to anything from that prior trial should be to the earlier "hearing." However, at no place in the record before us did Orange either challenge these procedures or inform the trial court that he wished to present evidence of the prior judgments.

Orange complains there is no motion in limine filed by the State in the appellate record, and he is correct—no such motion can be found. The State, however, seems to indicate that such a motion was filed. The "Agreement and Order Regarding Pre-Trial Motions" indicates that both Orange's motion in limine and a motion in limine filed by the State were agreed to by the parties.

21

Even without the State's motion before us, from statements by the parties and the trial court, it is clear that specifics of the prior trial were not to come before the jury. As we have mentioned, Orange never voiced any objection to this procedure. At one point he said, "I'm just extremely concerned that somewhere along the line it's going to lead into that area where we're trying to avoid, which is the three cases he's already been acquitted on." Then, after the trial court ruled that a video recording could be admitted into evidence and that Burch could sponsor its introduction, but that Burch could not mention when the warrant was executed, the following colloquy took place:

> [DEFENSE COUNSEL]: And then I also -- are we going to need motions in limine or anything limine-ing that -- are we off limits for talking about these other three cases?

> THE COURT: We are off limits talking about the other three cases. My understanding of what [the State] said, she wasn't even going to go into the date of the search warrant, that way it doesn't make the jury --

> [DEFENSE COUNSEL]: That is no problem. I'm just kind of curious how it's going to be phrased, as to how they entered his home, or they executed a search warrant . . . .

It is noted, further, at the conclusion of voir dire, the issue of the relevance of the prior acquittals was the subject of an exchange between the trial court and Orange's attorney, during which time the trial court indicated that Orange was not to raise the matter of those acquittals before the jury during the guilt/innocence phase of the trial. On the record, Orange's attorney then explained that instruction to Orange. During these discussions, neither Orange nor his attorney voiced any dissent from or objection to this instruction. Thus, although the trial court made no formal ruling at that juncture,

it is quite clear that Orange was well aware of the trial court's position regarding the admissibility of evidence of the prior trial, and Orange never objected to that position. He neither thereafter made an attempt to proffer evidence of the acquittal in the prior trial, nor obtained a ruling that he could not do so. In this context, it is appropriate to note that a ruling on a motion in limine is not a ruling that excludes evidence; rather, it merely requires the parties to approach the trial court for a definitive ruling before attempting to put on evidence within the scope of the order on the motion in limine. *Bobo v. State*, 757 S.W.2d 58, 61 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). "It is axiomatic that motions in limine do not preserve error." *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd). A ruling on a motion in limine is not a ruling on the merits, but only one which regulates the administration of a trial. Accordingly, Orange has failed to preserve any error concerning this matter for review.[14] *See* TEX. R. APP. P. 33.1.

Even had Orange preserved this claim for appellate review, we would find no reversible error. We review evidentiary rulings under an abuse of discretion standard. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). The trial court abuses its discretion when it acts "without reference to any guiding rules and principles, or acts in a manner that is arbitrary or capricious." *Lam v. State*, 25 S.W.3d 233, 236–37 (Tex. App.—San Antonio 2000, no pet.) (citing *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990)). A trial court does not abuse

---

[14]Even if Orange had opposed the State's motion in limine regarding evidence of the prior acquittal, it would have been necessary for him to obtain an adverse ruling during the trial which prevented him from offering the evidence in order to preserve any error in the matter. *See Harnett*, 38 S.W.3d at 655.

its discretion if its ruling was at least within "the zone of reasonable disagreement." *Salazar*, 38 S.W.3d at 153–54. At least two cases have found error where a trial court allowed the State to offer evidence concerning prior extraneous offenses, even though the defendant had been acquitted of those extraneous allegations. *Stuart v. State*, 561 S.W.2d 181, 182 (Tex. Crim. App. 1978); *McDowell v. State*, 142 Tex. Crim. 530, 155 S.W.2d 377 (1941). Here, it could not be said the trial court ruling was outside the zone of reasonable disagreement, and therefore, it cannot be said it abused its discretion. Orange's eighth point of error is overruled.

## XI. NO DOUBLE JEOPARDY

Orange claims that he was subjected to double jeopardy in violation of the United States and Texas Constitutions.[15] He argues that because J.P., the victim in the instant case, testified as a rebuttal witness in the previous trial (see our discussion of Orange's eighth point of error above), Orange cannot now be subjected to a trial where the prior trial's witness is now the complainant. Although Orange offers no authority or reasoning for this contention, it is assumed that he reasons that if a prior jury acquitted him in the previous case, that jury must have disbelieved J.P.'s testimony.

The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, protects an accused against a second prosecution for the same offense for which he has been previously acquitted or previously convicted. It also protects an accused from

---

[15]*See* U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 14.

being punished more than once for the same offense. *Littrell v. State*, 271 S.W.3d 273, 276 (Tex. Crim. App. 2008).

It seems self-evident that in two criminal allegations, even if the same crime is alleged, but different victims are alleged, the crime is not the same offense as contemplated by double jeopardy law. *See* Akhil Reed Amar, *Double Jeopardy Law Made Simple*, 106 YALE L.J. 1807, 1817–18 (1997).[16] For example, where a burglar takes numerous items from one house in one burglary, but the same items belong to a father and other items belong to the daughter, there is no double jeopardy violation in charging the burglar with two crimes: theft of the father's property and theft of the daughter's. *Iglehart v. State*, 837 S.W.2d 122, 128 (Tex. Crim. App. 1992).

Here, Orange was not charged with the same offense for which he was previously acquitted. No jeopardy attached.

We overrule Orange's ninth point of error.

---

[16]"[T]wo offenses cannot be the same if they have different legal elements. But under the Double Jeopardy Clause, an offense must not only be the same in law -- it must also be the same in fact. Even if Robert is convicted of robbery in an earlier trial, he may later be charged with and tried for robbery so long as the second indictment concerns a factually different robbery -- committed, say, on a different day against a different victim. . . . Even if the identity of the robbery victim and the day of the robbery are not formal elements of the offense of robbery -- in other words, even if the legal elements in Robert's two trials are identical -- Robert would have no good double jeopardy defense. He simply broke the same law twice, and thus he may be tried twice and punished twice. He may be 'twice put in jeopardy of life or limb' because he committed two offenses, not one."

25

## XII. NO ERRORS IN TRIAL COURT EVIDENTIARY RULINGS

Orange's tenth point of error complains of two trial court evidentiary rulings. We find no error and overrule the appellate contention.

### A. Adequate Proof of Venue

Orange complains that one of the witnesses for the State was allowed to provide hearsay testimony that proved venue. Officer Kevin Freeman testified that in the course of his investigation, he learned the alleged sexual abuse had occurred at 1320 Shirley Street. After the hearsay objection was overruled, Freeman said, "I was advised it occurred at 1320 Shirley Street." Next, he said that the Shirley Street address was outside the Kilgore city limits, but situated within Gregg County. Similar evidence came in via another witness. J.P.'s mother testified that during the period Orange lived with the Williams family, the family lived on Shirley Street. She then testified that their residence at that time was in the portion of the City of Kilgore lying in Gregg County. This testimony was not hearsay and elicited no objection. Even if Freeman's statement was hearsay and the admission of the statement was error, other evidence of the location of the family home was properly admitted. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding any error in admission of hearsay testimony was harmless in light of other properly admitted evidence proving same fact). Thus, there was sufficient evidence to prove venue by a preponderance of the evidence,[17] and Orange can prove no harm.

---

[17]TEX. CODE CRIM. PROC. ANN. art. 13.17 (Vernon 2005); *Murphy v. State*, 112 S.W.3d 592, 604 (Tex. Crim. App. 2003).

**B.      Extraneous Act Proved in State's Rebuttal Case**

In Orange's case-in-chief, he presented several witnesses who testified to his good reputation and to the effect that he was safe around children.  Persons testified for whom Orange had babysat, as did the parents of children whom Orange had babysat.  In rebuttal, the State called Officer Darren Mixon, who testified that sometime in 1999 or 2000, he responded to a call of a suspicious vehicle outside an elementary school in Kilgore.  He found Orange sitting in an automobile, about 75 to 100 yards from a playground, using binoculars to watch children on the playground.  Orange's explanation for this conduct was that he was watching a child for whom he was caring.  No criminal offense having occurred, Mixon told Orange to move along, and Orange complied.[18]

The trial court did a balancing test pursuant to Rule 403 and found the prejudicial import of the testimony did not substantially outweigh its probative value.  TEX. R. EVID. 403.  In making its ruling, the trial court said:

> The defense put the defendant's character, his character trait for safe dealing with children, at issue.  Therefore, based on that, this Court finds that under Rule 405, 404(b), that it is admissible.  Also, under a Rule 403 balancing test, I find that, while it may be prejudicial, it is relevant and that its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or undue delay.  Therefore, I will admit and allow that testimony.

As a general rule, to prevent an accused from being prosecuted for some collateral crime or misconduct, the State may not introduce evidence of bad acts similar to the offense charged.  *Roberts*

---

[18]Also, when the State cross-examined Orange's expert on child sexual abuse, Carol Walker, she was asked about the significance of a man watching children on a playground with binoculars: Walker said she would be "very concerned."

27

*v. State*, 29 S.W.3d 596, 600–01 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Rule 404 provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). However, evidence of extraneous acts and misconduct is admissible when it is relevant to a noncharacter conformity "fact of consequence" in a case, such as establishing motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or rebutting a defensive theory. *Id.*; *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002).

Evidence admitted as relevant under Rule 404(b) may nonetheless be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX. R. EVID. 403; *Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999). Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made on an improper basis, commonly, but not necessarily, an emotional one. *Mozon*, 991 S.W.2d at 847 n.7.

In conducting a Rule 403 balancing test, a trial court should consider the following factors: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000). The Texas Court of Criminal Appeals has held that the balancing test under Rule 403 weighs

28

in favor of the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *See Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003); *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997). With these principles in mind, we now examine the admissibility of the evidence at issue here under Rule 403.

We find the probative nature of Mixon's testimony weighs in favor of admission of this evidence. Much of the State's case was built around the theory of "grooming" and that Orange spent significant time with young J.P. Orange's own expert said that she would be very concerned if an adult were found watching children on a playground with binoculars. Because the bulk of Orange's defensive case consisted of witnesses who said he had provided safe child care, this evidence was relevant to rebutting Orange's defensive theory.

We acknowledge this evidence had the potential to impress the jury in an irrational, indelible way. For example, the jurors' affidavits discussed above both make mention of the significance the jury attributed to Mixon's testimony.[19] No criminal act was shown to have been committed by Orange in the events related by Mixon. This weighs against admission of the testimony.

Mixon's direct examination testimony took barely two pages of the court reporter's record. The time spent proving the extraneous act was negligible, which weighs in favor of its admission.

As for the State's need to present this evidence, we acknowledge that the complainant's credibility had been challenged throughout the trial; and J.P. had denied any inappropriate contact

---

[19]Obviously, for the reasons discussed in our preceding analysis, we only consider these affidavits anecdotally for purposes of reviewing the trial court's Rule 403 balancing test.

with Orange on more than one occasion before making his allegation. Based on the stream of witnesses Orange submitted who testified as to his sound character and appropriateness in being around children, we find this factor weighs slightly in favor of admission. We also point out, as cited above, the Texas Court of Criminal Appeals' holding that a balancing test under Rule 403 weighs in favor of the admission of relevant evidence. *Rayford*, 125 S.W.3d at 529.

We find admission of Mixon's testimony was within the zone of reasonable disagreement, and, therefore, the trial court did not abuse its discretion in admitting that testimony. Orange's tenth point of error is overruled.

As a final note, we point out that the trial court judgment lists the Texas Penal Code statute of the offense for which Orange was convicted, indecency with a child, to be Section 22.021(a)(2)(B) of the Texas Penal Code. TEX. PENAL CODE ANN. § 22.021(a)(2)(B) (Vernon Supp. 2009). However, the judgment is erroneous; that statute is aggravated sexual assault, a charge of which Orange was acquitted. The judgment is also erroneous in stating that Orange was convicted of a third-degree felony. Orange was indicted and convicted by a jury of indecency with a child by contact, pursuant to Section 21.11(a)(1) of the Texas Penal Code, a second-degree felony. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (Vernon Supp. 2009).

This Court has the authority to modify the judgment to make the record speak the truth when the matter has been called to our attention by any source. *French v. State*, 830 S.W.2d 607 (Tex. Crim. App. 1992). In *Asberry v. State*, 813 S.W.2d 526 (Tex. App.—Dallas 1991, pet. ref'd), the

30

court noted that the authority of the appellate court to modify incorrect judgments is not dependent on request of any party; the appellate court may act sua sponte. The Texas Rules of Appellate Procedure provide direct authority for this Court to modify the judgment of the trial court. TEX. R. APP. P. 43.2.

We modify the trial court judgment to accurately reflect the type and degree of offense for which Orange was convicted, the second-degree felony offense of indecency with a child by contact. As modified, we affirm.

Bailey C. Moseley
Justice

Date Submitted:      October 21, 2009
Date Decided:        November 19, 2009

Do Not Publish